Filed 3/27/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| In re<br>ROPATI AFATIA SEUMANU<br><br>on Habeas Corpus. | A169146<br><br>(Alameda County Super. Ct.<br>Nos. HCH24057A1, H24057A)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

The court orders that the opinion filed on March 11, 2024, be modified as follows:

1.  On page 27, in the second sentence of the third paragraph change the word "pass" to "passes" so the sentence reads:

    None of these claims passes the debatable-among-jurists-of-reason test for substantiality.

2.  On page 28, in the first sentence of the first full paragraph, insert the phrase "while he was gambling with a group of other juveniles" after the words "as a 14-year-old" so the sentence reads:

    In claim one, Seumanu argues he was denied a fundamentally fair penalty phase trial because his trial counsel failed to object to the prosecution's characterization of a fight Seumanu was involved in as a 14-year-old while he was gambling with a group of other juveniles.

The modifications effect no change in the judgment.

Dated:  March 27, 2024                    BROWN, P. J.

1

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:  Hon. Thomas Stevens

Counsel:      Michael R. Snedeker and Lisa R. Short, under appointment by
              the Court of Appeal, for Appellant.

              Rob Bonta, Attorney General, Lance E. Winters and James
              William Bilderback II, Senior Assistant Attorneys General,
              Alice B. Lustre, Supervising Deputy Attorney General, for
              Respondent.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


|  |  |
|---|---|
| In re<br><br>ROPATI AFATIA SEUMANU<br><br>on Habeas Corpus. | A169146<br><br>(Alameda County Super. Ct.<br>Nos. HCH24057A1, H24057A) |


Following the superior court's dismissal of a petition for habeas corpus relief in this capital case, petitioner Ropati Afatia Seumanu filed a notice of appeal and asked that we issue a certificate of appealability (COA) under Penal Code[1] section 1509.1, subdivision (c) (section 1509.1(c)). For the reasons explained below, we will issue a COA on one of nine claims in Seumanu's petition but will decline to do so as to the remainder of his claims.

Although this COA request is simply a motion—something we may resolve summarily, since we are not called upon to make a decision on the merits of an appeal—we publish this opinion because of the relative dearth of published case law applying our Supreme Court's holdings in *Briggs v. Brown* (2017) 3 Cal.5th 808, 825 (*Briggs*) and *In re Friend* (2021) 11 Cal.5th 720

---

[1] All further statutory references are to the Penal Code. All references to court rules are to the California Rules of Court.

(*Friend I*) and to provide some guidance as to how COA requests under 1509.1(c) should be handled more generally.

In the course of the opinion, we address three issues of first impression: (1) Is the 10-day time limit in section 1509.1(c) for the grant or denial of COA requests in the Court of Appeal mandatory or directory?  (2) How strong a showing must a COA applicant make to meet the "substantial claim for relief" test in section 1509.1(c)?  And (3) is an as-applied attack on the constitutionality of section 1509, subdivision (d) (section 1509(d)) appealable under section 1509.1(c)?

We answer those three questions as follows: (1) section 1509.1(c) sets no mandatory deadline for granting or denying COA requests, (2) a "substantial claim to relief" under section 1509.1(c) requires a showing strong enough for reasonable jurists to debate whether the trial court erred and thus that justifies allowing the appeal to proceed to decision on the merits, and (3) as-applied attacks on the constitutionality of section 1509(d) are appealable under section 1509.1(c).

We also address the requirement that a COA applicant under section 1509.1(c) provide an adequate record for review.  Several of Seumanu's claims fail to warrant issuance of a COA on that ground.  Nearly two years ago, the decision in *In re Friend* (2022) 76 Cal.App.5th 623, 639 (*Friend II*) made clear that COA applicants must provide a record sufficient to test allegations of ineffective assistance of counsel under the demanding standards that apply in this context.  We reiterate and in some respects expound upon what our colleagues in *Friend II* had to say on that issue.

Finally, in a rare but not unknown three-judge concurrence (see, e.g., *People v. Nguyen* (2017) 12 Cal.App.5th 44, 49–51) (conc. opn. of Bedsworth, J.), we add some additional observations about the applicant's burden to

2

provide adequate record materials.  In that separate opinion, we suggest that, for added clarity, the Judicial Council may wish to consider revisiting the rules of court dealing with the procedures for COA requests in proposed section 1509.1 appeals and the forms counsel are to use in preparing these requests.

## I. PROCEDURAL BACKGROUND

Because the facts of Seumanu's conviction offenses are of limited relevance to the nine claims for habeas corpus relief at issue here, we summarize below only the procedural background.  To the extent the crime facts bear on our analysis—on issues of prejudice, certainly they do—a factual recitation of the circumstances surrounding the offenses may be found in the Supreme Court's opinion affirming Seumanu's convictions and sentence on direct appeal.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1303–1307 (*Seumanu*).)  We assume familiarity with that opinion.

In 2000, a jury in Alameda County Superior Court convicted Seumanu of first degree murder (§ 187), kidnapping to commit robbery (§ 209, subd. (a)), and first degree robbery (§ 211).  (*Seumanu, supra,* 61 Cal.4th at p. 1302.)  Along with its verdicts of guilt on the first degree murder and kidnapping charges, the jury found true special circumstance allegations that Seumanu committed a murder while engaged in the commission of a robbery and a kidnapping.  (§ 190.2, subd. (a)(17)(A) & (B); *Seumanu,* at p. 1302.)

In addition, the jury found that for all three felonies, Seumanu used a firearm, to wit, a shotgun.  (§ 12022.5; *Seumanu,* at p. 1302.)  After weighing the aggravating and mitigating evidence, the jury set the penalty at death under the 1978 death penalty law.  (§ 190.1 et seq.; *Seumanu,* at p. 1302.)  The California Supreme Court affirmed his convictions and death sentence on automatic appeal.  (*Seumanu, supra,* 61 Cal.4th at p. 1377.)

In 2012, Seumanu sought collateral review of his conviction and sentence via habeas corpus petition in the California Supreme Court (the Initial Petition). Following the summary denial of the Initial Petition on the merits, Seumanu filed a petition for writ of habeas corpus in the United States District Court for the Northern District of California (the Federal Petition). Proceedings on the Federal Petition were stayed to allow Seumanu to exhaust his remedies in state court.

In 2022, Seumanu filed a petition for habeas corpus relief (the Exhaustion Petition) in the Alameda County Superior Court alleging nine claims that were not presented in the Initial Petition. In the Exhaustion Petition, he alleged that the failure to raise each of these nine claims by the attorney who prepared and filed his Initial Petition was constitutionally ineffective assistance of counsel.

In late September 2023, a little over 11 months after the Exhaustion Petition was filed, the assigned Alameda County Superior Court judge (the trial court) issued a reasoned order of dismissal under section 1509(d), relying on guidance from the Supreme Court in *Friend I, supra,* 11 Cal.5th 720, and more recently from our First District, Division Three colleagues in *Friend II, supra,* 76 Cal.App.5th at p. 639, which was decided on remand following the decision in *Friend I*.

The trial court found each of the claims in the Exhaustion Petition to be successive and rejected various arguments from Seumanu that section 1509(d) is unconstitutional. In the same order, the trial court declined to issue a COA. Seumanu filed a timely notice of appeal, which was lodged with this court on November 27, 2023.

Accompanying his notice of appeal was a request that we issue a COA and appoint attorneys Michael Snedeker and Lisa Short to represent him in

4

this appeal. These two attorneys were appointed by the United States District Court for the Northern District of California in 2017 to represent Seumanu in connection with the Federal Petition. They filed and pursued the Exhaustion Petition in the trial court, and then prepared the notice of appeal and the COA request.

## II. PROPOSITION 66 BACKGROUND

Before we turn to the core issue presented here—whether Seumanu is entitled to a COA—we preface our analysis by sketching out some general legal background concerning Proposition 66, a statutory ballot initiative adopted by the voters at the November 2016 statewide election. (*See Briggs*, *supra*, 3 Cal.5th at pp. 822–823.)

"Proposition 66 enacted a number of statutory reforms in an effort to make the system of capital punishment 'more efficient, less expensive, and more responsive to the rights of victims.' [Citation.] Among these reforms were various changes to the procedures for handling and resolving habeas corpus petitions in capital cases. [Citation.] The bulk of these changes are found in newly added Penal Code section 1509." (*Friend I*, *supra*, 11 Cal.5th at p. 725.)

The Proposition 66 scheme draws a fundamental distinction between "initial" petitions for habeas corpus relief and "successive" petitions for habeas corpus relief. (See § 1509(d); § 1509, subd. (a).) Central to the scheme is section 1509(d), which requires dismissal of any "successive" petition "unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence." As defined by section 1509(d), the statutory phrase " '[i]neligible for the sentence of death' " means "circumstances exist placing that sentence outside

5

the range of the sentencer's discretion" (for example, the petitioner was under the age of 18 when the crime of conviction took place, or suffers from an intellectual disability). "A claim relating to the sentencing decision under Section 190.3 is not a claim of actual innocence or ineligibility for the purpose of this section." (§ 1509(d).)

Prior to Proposition 66, "Whereas the approved practice was for all capital habeas corpus petitioners to file directly" in the California Supreme Court, "Penal Code section 1509 now calls for most capital petitions to be heard initially in the sentencing court." (*Friend I, supra*, 11 Cal.5th at p. 726; § 1509, subd. (a).) The superior court must issue "a statement of decision explaining the factual and legal basis for its decision" resolving any such petition (§ 1509, subd. (f)), subject to review in the Court of Appeal (§ 1509.1). The availability of an appeal from the denial of habeas corpus relief in capital cases is new. Under pre-Proposition 66 law—which remains the law in non-capital cases—"there [wa]s no right to appeal a superior court's *denial* of habeas corpus relief." (*Briggs, supra*, 3 Cal.5th at p. 825.) A capital habeas corpus petitioner could only obtain a second look at the superior court's refusal to grant habeas relief by filing a new habeas petition in a higher court, while the People could appeal a *grant* of relief in a capital case directly to the California Supreme Court. (*Ibid*.)

"Proposition 66 alter[ed] these procedures by permitting either party to take an appeal from a superior court's decision on an initial habeas corpus petition to the Court of Appeal, and by specifying that '[a] successive petition shall not be used as a means of reviewing a denial of habeas relief.' " (*Briggs, supra*, 3 Cal.5th at p. 825; § 1509.1, subd. (a).) For a petitioner seeking review of the denial of a successive petition, an appeal may not be taken as of right. Section 1509.1(c) states, "The petitioner may appeal the decision of the

6

superior court denying relief on a successive petition only if the superior court or the court of appeal grants a [COA]."

To obtain a COA, a petitioner must show both "a substantial claim for relief . . . and a substantial claim that the requirements of subdivision (d) of Section 1509 have been met." (§ 1509.1(c).) There are also rules governing the timing of decisions on COA requests. The superior courts must decide whether to grant or deny a COA "concurrently with a decision denying relief on the petition." (§ 1509.1(c).) And when a COA is sought on appeal—as it must be where, as in this case, a notice of appeal from the denial of relief on a successive petition arrives in the appellate court without a COA from the superior court—"The court of appeal shall grant or deny a request for a certificate of appealability within 10 days of an application for a certificate." (*Ibid*.)

## III. REQUEST FOR COUNSEL APPOINTMENT

First, we attend to an administrative housekeeping matter—Seumanu's request for appointment of Snedeker and Short as his counsel in these appellate proceedings. We will grant that request.[2] For any such

---

[2] The check-the-box request for appointment of counsel in Seumanu's notice of appeal provided no information complying with rule 8.391. That rule sets minimum standards for appointment of counsel in appeals under section 1509.1 from superior court decisions in death penalty-related habeas corpus proceedings. On February 14, 2024, we directed that Seumanu provide sufficient information to demonstrate Snedeker and Short have "the commitment, proficiency, and knowledge necessary to represent [him] competently" in this court under rule 8.652(i), which establishes a qualification standard specifically applicable to counsel appointments for the purpose of exhausting state court remedies where there has been a prior federal appointment. We also directed that Seumanu himself file a declaration in compliance with rule 8.391(a)(3) requesting continued representation by Snedeker and Short. On March 1, 2024, we received

appointment, rule 8.391(a)(3) requires that we "designate assist[ing] counsel." We designate Snedeker and Short to assist each other in these proceedings.

In granting Seumanu's request for appointment of counsel on appeal, we emphasize that we have no statutory basis to authorize payment of compensation to counsel at this time. The declaration filed by Snedeker in support of Seumanu's appointment request acknowledges that this is "the current California norm for exhaustion petitions in the Courts of Appeal," and further states "I hope to be eventually paid by the federal court, since this [appeal] is a necessary step in the process of presenting Mr. Seumanu's claims to the state court, a prerequisite to their being considered on the merits in federal court." Though practices may vary in other federal districts, it is our understanding that the hope expressed in Snedeker's declaration—a hope we share—is consistent with the practice currently being followed in the United States District Court for the Northern District of California.

## IV. THE TEN-DAY TIME LIMIT TO GRANT OR DENY COA REQUESTS IN THE COURT OF APPEAL

Turning the merits of the COA request, we must decide as a threshold matter whether the 10-day time-limit on the grant or denial of COA requests in the Court of Appeal under section 1509.1(c) is mandatory or directory. The Supreme Court's landmark opinion in *Briggs v. Brown*, *supra*, 3 Cal.5th 808, addressed that issue for other fixed time limits imposed by Proposition 66— the five-year deadline for direct and collateral review in capital cases and the one-year deadline for deciding capital habeas petitions, deadlines which the

declarations from Snedeker and Seumanu providing satisfactory information in compliance with these rules.

court held are directory (*id*. at pp. 848–861)—but it did not address the 10-day limit in section 1509.1(c).  Because we must "consider, sua sponte, whether we have appellate jurisdiction" (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 301 (*Keck*)), we now address the 10-day limit in this case.

*Friend I* establishes the procedural backdrop.  Addressing the "procedures for appellate review of a trial court's determination that one or more claims in a subsequent petition are successive" (*Friend I*, *supra*, 11 Cal.5th at p. 745), *Friend I* holds that "Proposition 66 can and should be read to provide a means for appealing the superior court's determination that a subsequent petition is successive." (*Friend I,* at p. 747.)  The court finds the authority for such appeals in section 1509.1(c). (*Friend I,* at p. 747.)  Thus, even where the superior court has denied a COA on the merits of the claims in a subsequent petition that has been found to be successive, the Court of Appeal may issue a COA under section 1509.1(c) on "the successiveness question itself." (*Friend I,* at p. 747.)

In such a scenario—which describes this case—section 1509.1(c) states that a Court of Appeal "shall" grant or deny a COA request within 10 days of the time such a request is made.  (See rule 8.392(b)(6) [10-day deadline runs from date of "the filing of the request in [the Court of Appeal]"].)  We received Seumanu's notice of appeal on November 27, 2023, and since he checked a box in the notice requesting a COA, the 10-day clock began to run that day.  Because more than 10 days have elapsed since then, we must decide whether the deadline specified in section 1509.1(c) is jurisdictionally mandatory, and thus whether automatic dismissal of Seumanu's COA request is required based on the passage of time alone.

9

On December 1, 2023, we requested the Attorney General to file a brief addressing this issue. With the caveat that the language of section 1509.1(c) might be read to create a 60-day jurisdictional deadline starting from the date a notice of appeal is filed in the superior court, the Attorney General took the position that "the 10-day limitation of section 1509.1, subdivision (c)" is not jurisdictional and "may be exceeded for good cause."[3] We agree, but we also reject the idea that section 1509.1(c) specifies *any* jurisdictionally mandatory decisional deadline.

In an order issued December 5, 2023, we announced this ruling and invited any party who disagrees to seek immediate relief by writ in the Supreme Court. That order stated as follows: "The court has concluded that the 10-day period in . . . section 1509.1(c) for a court of appeal to grant or deny a request for a certificate of appealability is directory, not mandatory. . . . The court has further concluded that Penal Code section 1509.1, subdivision (c) does not require the court to decide the request for a certificate of appealability within 60 days after appellant filed a notice of appeal in the superior court. As expeditiously as possible, the court intends to issue an order explaining in more detail the basis for these conclusions." Neither party objected to our announced ruling or sought emergency relief. This opinion provides the more fulsome explanation of reasons we indicated would be forthcoming.

---

[3] In a footnote, the Attorney General drew our attention to language in section 1509.1(c) stating that "[t]he jurisdiction of the court of appeal is limited to the claims identified in the [COA] and any additional claims added by the court of appeal within 60 days of the notice of appeal." In light of this language, the Attorney General noted, "it is arguable that a failure to grant an application for a certificate within the 60-day time frame could raise jurisdictional issues."

The reasoning in *Briggs* compels the conclusion we have reached. The *Briggs* opinion began its discussion by acknowledging the Legislature's power to regulate the speed at which adjudication in the courts takes place. (*Briggs*, *supra*, 3 Cal.5th at pp. 848–849.) To illustrate, the court pointed to commonly used provisions that grant "priority to certain matters" and require courts to "conduct proceedings as speedily as possible." (*Ibid*.) But the court then went on to discuss *Garrison v. Rourke* (1948) 32 Cal.2d 430, and a long line of similar cases that construe statutes as directory in some circumstances, even when the Legislature uses the language of command. (*Id*. at pp. 849–854.)[4] The *Garrison* line of cases recognizes that "while the Legislature has broad authority to regulate procedure, the constitutional separation of powers does not permit statutory restrictions that would materially impair fair adjudication or unduly restrict the courts' ability to administer justice in an orderly fashion." (*Briggs*, *supra*, 3 Cal.5th at p. 854; see *People v. Engram* (2010) 50 Cal.4th 1131, 1146–1149, 1161–1162.)

When addressing the question whether a statute that appears to command courts to proceed in a specified manner is mandatory or directory, these cases adopt a clear statement rule of construction in order to avoid the constitutional separation of powers concerns that such commands create. (*Briggs*, *supra*, 3 Cal.5th at pp. 877–878 (conc. opn. of Liu, J.).) In cases involving fixed decisional time limits, an "intent to divest the court of jurisdiction 'is not read into the statute unless that result is expressly provided or otherwise clearly intended.' " (*Briggs*, at p. 835.) "[T]he

---

[4] See *Thurmond v. Superior Court of City and County of San Francisco* (1967) 66 Cal.2d 836, 839; *Lorraine v. McComb* (1934) 220 Cal. 753, 756–757; *In re Shafter-Wasco Irrigation District* (1942) 55 Cal.App.2d 484, 487–489 (*Shafter-Wasco*); see also *Verio Healthcare, Inc. v. Superior Court* (2016) 3 Cal.App.5th 1315, 1329.

legislative intent must be gathered from the statute as a whole, from the nature and character of the act to be done and from the consequences which would follow the doing or not doing of the act at the required time." (*Garrison v. Rourke*, *supra*, 32 Cal.2d at p. 437.) And in undertaking this analysis, the pivotal issue is often whether there is a consequence or penalty for missing the deadline. If no consequence or penalty is provided, a statutory time limit will be deemed directory. (*Briggs*, at p. 849.)

Ultimately, the absence of any enforcement mechanism is what drove the *Briggs* court's analysis. After reviewing the text and structure of the statutory deadlines at issue, as well as pertinent ballot materials that accompanied Proposition 66, the *Briggs* court concluded that, since neither the five-year deadline specified by section 190.6, subdivision (d), nor the one-year deadline specified by section 1509, subdivision (f), is subject to any enforceable consequences when the statutory deadline is missed, each statute is directory. (*Briggs*, *supra*, 3 Cal.5th at pp. 858–860.) The *Briggs* court did not address the provision in section 1509.1, subdivision (c), requiring Courts of Appeal to decide requests for COAs within specified periods of time. But among the cases cited and relied upon in *Briggs* was *In re Shafter-Wasco*, *supra*, 55 Cal.App.2d 484, a case involving a statutory decisional deadline to decide an appeal.

*Shafter-Wasco* involved a motion to dismiss an appeal that was not decided within three months, the specified time period for deciding appeals of the kind at issue there. The court stated the issue presented as follows: "May the Legislature divest this court of its constitutional jurisdiction over the case and its duty to decide it by limiting the time in which a decision must be rendered, to a period within which it is impracticable, if not impossible, to decide the issues?" (*Shafter-Wasco*, *supra*, 55 Cal.App.2d p. 487.) Answering

12

that question no, the court observed, "We find but one limitation in the Constitution on the time within which an appeal must be decided. (§ 24, art. VI, Const.) The penalty there provided for failing to decide a case within ninety days after it has been submitted for decision is not loss of jurisdiction over the case by the court, but suspension of the right of the justices to draw their salaries." (*Ibid.*)

The court went on: "If the statute in question be strictly construed as mandatory and as divesting this court of jurisdiction in three months after the appeal was taken," resolution of the appeal would have been required "one month and two days after the record was filed . . . , three days after appellant's opening brief was filed and twenty-seven days before respondents' brief was due for filing." (*Shafter-Wasco*, *supra*, 55 Cal.App.2d at p. 487.) "We regard such a limitation on our constitutional power to decide the case as unreasonable," the *Shafter-Wasco* court stated. (*Ibid.*) "While the record is not formidable it is not inconsiderable. While we have not examined it, there may be presented serious questions for decision that might require careful consideration which could not be given within the time provided by the statute." (*Ibid.*)

The same thing may be said here, even though in deciding a COA request under section 1509.1(c) we need only delve into the merits of a proposed appeal provisionally. No appellate court makes decisions on the fly. For each judge, reading submitted briefs and coming to some rough sense of likely outcome is only the beginning of the process.[5] In-depth review of cited

---

[5] See Hon. Frank M. Coffin, The Ways of a Judge: Reflections from the Federal Appellate Bench (1980) page 62 (Ways of a Judge) ("Perhaps there are appellate judges who, on hearing the essential facts of . . . a case, can confidently announce a sound decision without pause. I have seen professors

cases and the record is the next step, which requires considerable time.  The deliberative time required for good collegial decision making will often require extensive intra-panel consultations, orally and in writing, even for writs and motions that may ultimately be resolved by summary order.  And in coming to final decision, the time needed for reflection is a must, especially for first-impression legal issues that are being decided without the benefit of controlling precedent.  Except for the constitutionally mandated 90-days-from-submission deadline, no one-size-fits-all timeframe can be placed on the decisional process.[6]

All of this is especially true in the context we have here, since the stakes in capital litigation are so high.  It is even conceivable that, contrary to voters' intent in seeking to accelerate the review of death judgments under the Proposition 66 scheme, rigid compliance with a fixed decisional timeframe in resolving COA requests could have the unintended consequence of lengthening the overall process of collateral review, rather than speeding it up.  Pressed by the need to make a quick call in the face of a hard deadline, some courts could default to issuing a COA on all plausible grounds for error where there is insufficient time to probe the substantiality of a proposed appeal.

---

in the classroom so respond; also panelists, lecturers, and cocktail-party pundits.  But I am thankful nothing said under such circumstances affects the rights of the parties.").

[6] Coffin, Ways of a Judge, *supra*, at page 61 (In appellate decision making, "there is rarely such a thing as a mandatory deadline.  If a court has trouble in developing a consensus, it waits until it has a majority—until each judge in the fullness of his [or her] reflections and the freedom of his [or her] conscience takes [a] final stand.  The process allows scope for maturation, the slow, subconscious germination of thought.").

Accordingly, because section 1509.1(c) provides "no effective mechanism" to enforce the 10-day period (see *Briggs*, *supra*, 3 Cal.5th at p. 855), and because strict enforcement of the 10-day period "would materially impair fair adjudication" of this case and unduly restrict our ability to "administer justice in an orderly fashion" (*id.* at p. 854), we hold that the 10-day deadline in section 1509.1(c) is directory, not mandatory. To the extent the language of section 1509.1(c) can be read to impose a jurisdictional 60-day deadline running from the filing of a notice of appeal in the superior court, we hold that that time period, too, is directory.

These two specified time periods provide aspirational benchmarks that must be taken into account in applying the overall directive under section 1509.1(c) that "[a]n appeal under this subdivision shall have priority over all other matters and be decided as expeditiously as possible." The 30-day jurisdictional deadline to file a notice of appeal under section 1509.1(c), of course, remains applicable, and the super priority over "all other matters" that appellate proceedings authorized by section 1509.1(c) must receive—which is extraordinary in itself—cannot be ignored. But if more than 10 or even 60 days is reasonably necessary for proper consideration of whether a COA may issue, the time may be taken.

### V. ENTITLEMENT TO A COA

Construing Seumanu's application for a COA from us as a request for a COA on the successiveness determination by the trial court—that is, a COA directed to the "successiveness question itself" (*Friend I*, *supra*, 11 Cal.5th at p. 747)—we now turn to a review of this issue under the standard for issuance of a COA in section 1509.1(c). As noted above, section 1509.1(c) provides as follows: "A certificate of appealability may issue under this subdivision only if the petitioner has shown both a substantial claim for relief

15

. . . and a substantial claim that the requirements of subdivision (d) of Section 1509 have been met."

In applying this standard, it is tempting to move immediately to the second element—the substantiality of the petitioner's claim that the "requirements of subdivision (d) have been met," and to deny a COA summarily in all cases not involving a claim of actual innocence or ineligibility for the death penalty. But in appeals of the "successiveness question itself," the *Friend I* court held that the COA standard "may be read to permit a certificate 'to issue when the petitioner has set forth a substantial argument that section 1509(d) does not apply at all' " because the petition at issue is not successive. (*Friend I, supra*, 11 Cal.5th at pp. 746–747.)

Accordingly, our sole focus here is on whether Seumanu has made a substantial showing that his unexhausted claims are not "successive" within the meaning of section 1509(d). A "substantial showing" does not require a showing that, at this preliminary stage, convinces us the appellant is likely to prevail. Our colleagues in *Friend II* noted but did not rule on what this standard requires. We must address it here, since one of the claims at issue—claim four, at least in one respect as we explain below—pleads ineffective assistance of counsel with enough particularity to support a determination of non-successiveness on that ground.

Initiative measures "are subject to the ordinary rules and canons of statutory construction." (*Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 549.) When interpreting statutory language, a court may "compare the provision to the construction given other similar statutes" (*Nakamura v. Superior Court* (2000) 83 Cal.App.4th 825, 834), including federal statutes when they have similar

16

" 'objectives and relevant wording' " (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 563).  Here, we have an analogous federal statute.  A COA procedure in the federal Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, is markedly similar to the COA procedure in section 1509.1(c).

Under AEDPA, an appeal may be taken from "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" (28 U.S.C. § 2253(c)(1)(A)) only if "a circuit justice or judge issues a certificate of appealability" (28 U.S.C. § 2253(c)(1)).  To meet the standard for issuance of a COA under this statute, the prisoner must make a "substantial showing of the denial of a constitutional right." (28 U.S.C. § 2253(c)(2).)  In *Slack v. McDaniel* (2000) 529 U.S. 473 (*Slack*), the United States Supreme Court held that "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  (*Id*. at p. 484.)

Borrowing from the top court's approach to section 2253(c) of AEDPA, we hold that the substantiality standard under section 1509.1(c) is met where the COA applicant makes a case strong enough for reasonable judges to debate whether the trial court's successiveness ruling was incorrect.

## A. *Successiveness as Construed and Applied in* Friend I

In applying the "substantial claim for relief" test under section 1509.1(c), what does the undefined statutory term "successive" mean? *Friend I* supplies the answer.  "Several decades ago," the *Friend I* court explained, "California courts identified presentation of claims in a

17

' "piecemeal [manner] by successive proceedings" ' as an abuse of the writ process." (*Friend I*, *supra*, 11 Cal.5th at pp. 727–728.) To deal with this problem, courts developed "the so-called successiveness bar, a set of limits that . . . continues to apply to noncapital cases today." (*Id.* at p. 728.) Construing the codification of this bar in section 1509(d), the *Friend I* court held that the statute only mandates dismissal of claims that were unjustifiably omitted from an initial petition. (*Friend I*, *supra*, 11 Cal.5th at p. 741.)

Before reaching this conclusion, the court set the stage with an in-depth discussion of pre-Proposition 66 law. (*Friend I*, *supra*, 11 Cal.5th at pp. 730–733.) The key issue in abuse of the writ cases pre-dating Proposition 66, the court explained, was whether the petitioner failed to bring claims in an initial petition that, "even with reasonable diligence, could not have been discovered and presented earlier." (*Friend I*, at p. 741.) To identify and deal with these circumstances, courts engaged in a two-step analysis. (*Id.* at pp. 728–729.) Even in cases where a petitioner could not adequately justify failing to raise a claim earlier, there was traditionally a second step to the analysis where courts would entertain successive claims on the merits in exceptional circumstances. "At this second step . . . court[s] would determine whether the petitioner had made a showing that the successive claim fell within [a] . . . fundamental miscarriage of justice exception set out in *In re Clark* (1993) 5 Cal.4th 750 (*Clark*)." *(Friend II*, *supra*, 76 Cal.App.5th at p. 631.)

Mindful of this traditional two-step analytical framework, the *Friend I* court construed the statutory term "successive" in the sense courts have always construed it. (*Friend I*, *supra*, 11 Cal.5th at pp. 730–733.) The court held that not every "subsequent" petition—that is, not every new petition

18

brought chronologically after an "initial" petition—will be deemed "successive" within the meaning of section 1509(d). (*Friend I*, at pp. 734–736.) A showing of adequate justification for omitting a claim in an "initial" petition will mean that, if brought promptly upon discovery in a subsequent petition, new claims will not be "successive" and thus will not be subject to the section 1509(d) bar. A broader interpretation that would rigidly block habeas corpus petitioners from gaining access to court regardless of any justification that the petitioner may have had for failing to assert new claims earlier, the court held, would raise "substantial constitutional doubts." (*Friend I*, at p. 739.)[7]

While it is "rare" and "unusual" to see a successful showing of non-successiveness (*Friend I*, *supra*, 11 Cal.5th at p. 728), *Friend I* holds that capital habeas petitioners can establish adequate justification for omitting claims from an initial petition in three circumstances, each drawn from prior abuse of the writ cases. First, non-successiveness is established " 'where the factual basis for a claim was unknown to the petitioner and he had no reason

_____

[7] Some amici curiae in *Friend I* (*Friend I*, *supra*, 11 Cal.5th at p. 729) advocated a sweeping interpretation of "successive"—essentially a "one-strike and you're out" rule—that would have rigidly foreclosed claims "based on newly available evidence of trial misconduct by jurors, the prosecutor, defense counsel, or the trial judge" where the misconduct was "serious enough to call into question the validity of the judgment, yet fail[ed] to meet section 1509(d)'s innocence or ineligibility standard." (*Id.* at p. 735.) "Similarly," the court explained, the broad reading urged by these amici would have barred claims where "posttrial scientific developments . . . yield[ed] evidence that critically undermine[d] confidence in the jury verdict without establishing innocence or death ineligibility." (*Ibid.*) These were some of the concerns that led the court to accept the argument that a "narrower understanding of Proposition 66's successiveness provisions is not only plausible, but compelled by the canon of constitutional avoidance." (*Id.* at p. 734.)

19

to believe that the claim might be made' and the claim is 'asserted as promptly as reasonably possible.' " (*Id.* at p. 731.) Second, in cases involving "claims based on a change in the law that is retroactively applicable to final judgments," promptly asserted claims in a subsequent petition for habeas relief will be considered if the application of preexisting law would be prejudicial. (*Ibid.*) "And finally, the ineffective assistance of prior counsel may justify raising a claim in a subsequent petition." (*Ibid.*)

Even for petitions found to be successive, the second step of the analysis provides the ultimate backstop—an exception for miscarriages of justice.[8] Traditionally, this exception, which was fully enunciated in *Clark, supra*, 5 Cal.4th at pp. 795–798, applied in four circumstances: "(1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) that the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death; (4) that the petitioner was

---

[8] In its order of dismissal, the trial court uses the term "safety valve" to describe *Clark*'s miscarriage of justice circumstances. That is somewhat imprecise. The *Friend I* court consistently used the term "safety valve" to describe exceptions to the general rule of successiveness in abuse of the writ cases. (*Friend I, supra*, 11 Cal.5th at pp. 728, 729, 736, 741.) These exceptions apply at the front end of the analysis, and for petitions not deemed to be successive, they render *the successiveness bar* inapplicable. The *Clark* miscarriage of justice circumstances, by contrast, which more generally apply to *the entire abuse of the writ doctrine*, only kick in at the back end of the analysis, after a petition has been determined to be successive. In light of that analytical distinction, and to avoid confusion, we refer to the *Clark* miscarriage of justice circumstances as a "backstop," not as a "safety valve."

convicted or sentenced under an invalid statute." (*Ibid.*; see *Friend I, supra*, 11 Cal.5th at p. 728.) Under *Clark*, these claims could be "considered on their merits even though presented for the first time in a successive petition or one in which the delay has not been justified." (*Clark*, at p. 798.) But section 1509(d) deletes the first and third miscarriage of justice circumstances under the *Clark* test.

As section 1509(d) was construed and applied in *Friend I*, the statute "preserves the traditional two-step inquiry described in case law, but at the second step it replaces the four-part fundamental miscarriage of justice exception with just two grounds—actual innocence or death ineligibility— that will justify giving a habeas corpus petitioner a second chance to raise a claim . . . unjustifiably omitted from a prior petition." (*Friend I, supra*, 11 Cal.5th at pp. 729, 739–740.) Thus, in the end, the court struck a careful balance. Applying the traditional understanding of the term "successive" to section 1509(d) respects and leaves room for the constitutionally protected right of capital prisoners to seek habeas corpus relief (*Friend I*, at p. 736),[9] but at the same time carries out the voters' intent in seeking to tighten the procedural standards governing capital habeas litigation.

Summing up its analysis, the *Friend I* court stated, "the voters' intent in using the term 'successive' in section 1509(d) was to build on, rather than fundamentally reconfigure, the concept of 'successiveness' as it has developed

---

[9] California Constitution, article I, section 11 ("Habeas corpus may not be suspended unless required by public safety in cases of rebellion or invasion."); s*ee Friend I, supra*, 11 Cal.5th at p. 736 ("The California Constitution has protected the right to seek relief by habeas corpus since our state's founding"; and the right to invoke the writ, which " 'often represents a prisoner's last chance to obtain judicial review' of a criminal conviction," is "an avenue to relief in service of principles of substantial justice").

in the case law." (*Friend I, supra*, 11 Cal.5th at p. 741.) "Rather than presume the voters intended a sea change in habeas corpus law that would, for the first time, eliminate the established safety valve for claims that could not have reasonably been raised earlier," the court said, "we instead conclude they determined to tighten the standards courts have developed to deter abuse of the writ of habeas corpus by making it harder for capital petitioners to earn a second chance to raise claims they could, and should, have raised earlier." (*Ibid.*)

One last aspect of *Friend I* must be kept in mind. In applying the nuanced reading of the statutory term "successive" adopted in that case, it is important to underscore that the decision in *Friend I* was statutory in nature. Although the doctrine of avoiding decision on constitutional questions played a major role in the Supreme Court's approach to statutory construction, the court emphasized it was not "definitively resolv[ing]" the constitutional questions raised by foreclosing all but the first attempt at obtaining collateral review, excepting only cases of actual innocence or ineligibility for capital punishment. (*Friend I, supra*, 11 Cal.5th at p. 736.) Most pertinently for this case, as we explain below, the court also took care to note that it was not addressing any constitutional questions raised by that narrowing of *Clark*'s backstop miscarriage of justice exception, as applied in future cases. (*Id.* at p. 740, fn. 14 ["[n]o issue regarding the constitutionality of this change is raised here . . . and we express no opinion on the matter"].)[10]

---

[10] *Briggs* makes a similar point about future, as-applied constitutional challenges. (See *Briggs, supra*, 3 Cal.5th at p. 848 ["Going forward, prisoners may seek to challenge such limitations in the context of their individual cases. We express no view on their prospects for relief, holding only that the modifications imposed by section 1509 do not materially impair the functioning of the courts."]; *id*, at p. 868 (conc. opn. of Liu, J.) ["the

**B.** *Ineffective Assistance of Counsel as a Justification for Failure To Assert the Unexhausted Claims In the Initial Petition*

Seumanu makes no contention that the factual bases of his nine unexhausted claims were unknown to him in 2012 or that some retroactive change in the law justifies his omission of those claims from the Initial Petition. Rather, under the third prong of *Friend I*'s test for successiveness, he argues that his former post-conviction counsel was constitutionally ineffective for failing to raise them. For that reason, he contends, he was adequately justified in omitting these claims from the Initial Petition, and the trial court erred in concluding to the contrary.

The applicable Sixth Amendment standard here is well-established. To succeed with a claim of ineffective assistance of counsel, Seumanu must make an initial showing that some act or omission by his counsel " 'fell below an objective standard of reasonableness' " (*In re Long* (2020) 10 Cal.5th 764, 773 (*Long*)), when judged "in light of 'the professional norms prevailing when the representation took place' " (*Long*, at p. 773; see *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*)). Then there is the further requirement of showing prejudice. It is necessary to "show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Long*, at p. 773.) Here, Seumanu "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Strickland*, at p. 693.) It is enough to show "a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

On the element of deficient performance, " '[T]he standard for judging counsel's representation is a most deferential one.' " (*Long*, *supra*, 10 Cal.5th

constitutionality of Proposition 66's restrictions on successive petitions . . . has yet to be fully tested"].)

23

at p. 773, quoting *Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Richter*).)
"We 'must indulge a "strong presumption" that counsel's conduct falls within
the wide range of reasonable professional assistance because it is all too easy
to conclude that a particular act or omission of counsel was unreasonable in
the harsh light of hindsight.' " (*Long*, at p. 773.) " 'Unlike a later reviewing
court, the attorney observed the relevant proceedings, knew of materials
outside the record, and interacted with the client, with opposing counsel, and
with the judge.' " (*Ibid.*) "Accordingly, we must 'reconstruct the
circumstances of counsel's challenged conduct, and . . . evaluate the conduct
from counsel's perspective at the time.' " (*Id.* at pp. 773–774.)

In capital habeas proceedings, the pleading standard applicable to both
prongs of the *Strickland* test is strict. "To justify a second or subsequent
filing based on prior ineffective assistance of counsel, the petitioner must
'allege with specificity the facts underlying the claim that the inadequate
presentation of an issue or omission of any issue reflects incompetence of
counsel . . . . Moreover, mere omission of a claim "developed" by new counsel
does not raise a presumption that prior habeas corpus counsel was
incompetent, or warrant consideration of the merits of a successive petition.' "
(*Friend I, supra*, 11 Cal.5th at p. 731, fn. 5.) Expounding on *Friend I*'s
discussion of this pleading standard, the *Friend II* court held that *Strickland*
must be applied in the capital habeas context " 'with scrupulous care, lest
"intrusive post-trial inquiry" threaten the integrity of the very adversary
process the right to counsel is meant to serve.' " (*Friend II, supra*,
76 Cal.App.5th at p. 637, quoting *Richter, supra*, 562 U.S. at p. 105.) By
scrupulously applying *Strickland* and imposing a strict pleading
requirement, courts can "guard against easy sidestepping of the

24

successiveness bar" and promote the goals of Proposition 66's death penalty reforms. (*Friend II*, at p. 637.)

One additional aspect of the holding in *Friend II* is especially relevant here. Not only must the *Strickland* standard be applied scrupulously, the *Friend II* panel explained, but "it [is] equally important" that a capital habeas corpus petitioner's request to the Court of Appeal for a COA " 'include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.' " (*Friend II, supra*, 76 Cal.App.5th at p. 637, quoting *People v. Duvall* (1995) 9 Cal.4th 464, 474.) "[T]he pre-Proposition 66 practice of simply citing to transcript pages in the record is unhelpful to a meaningful evaluation of whether the requisite substantial claims have been presented." (*Friend II,* at p. 637.)

One approach to meeting this burden might be to "lodge" the "capital record on appeal . . . with the appellate court" (*Friend II, supra*, 76 Cal.App.5th at p. 628), but the governing rules of court do not currently *require* it. Indeed, under those rules, the process of preparing the record in a section 1509.1 appeal does not even begin until a COA issues. (See rule 8.395(c)(2)(A).)[11] In the meantime, indiscriminately providing the entire record of prior capital proceedings may well be counterproductive. Selectivity is always important in effective advocacy, but in the context of COA requests

---

[11] If and when the record is prepared, it may be vast. It must include not only the clerk's transcript (rule 8.395(d)) and the reporter's transcript (rule 8.395(e)), but the record of the automatic appeal and prior habeas proceedings (rule 8.395(a)(1)(E)). And the documents to be included in the clerk's transcript must include not only documents filed with the trial court, but documents lodged with the trial court. (Rule 8.395(a)(1)(F).)

in section 1509.1 appeals, it is especially important given the exigencies of resolving these requests.[12]

While there is no requirement that putative appellants in section 1509.1 appeals provide a full record of all prior proceedings in support of their COA requests, we do need enough of the record to conduct a meaningful assessment of the successiveness ruling the petitioner attacks as erroneous. In order to facilitate expeditious resolution of COA requests in accordance with our statutory obligations, the burden lies with the movant to provide adequate supporting record materials at the time COA requests are filed so that we may determine whether the substantiality standard under section 1509.1(c) has been met.

---

[12] Declarations addressing the performance prong of the *Strickland* ineffective assistance of counsel test will at a minimum be required for us to make an assessment of successiveness issues that turn on ineffective assistance of counsel. Beyond that, what a petitioner should submit to support a COA in a proposed section 1509.1 appeal will vary widely depending on the type of claims presented. To illustrate based on the claims proposed for appeal in this case, some of Seumanu's claims are purely legal (i.e., claims seven, eight and nine) and, for record support, probably need nothing more than judicially noticeable background facts from the California Supreme Court's opinion on direct appeal; other claims focus on the voir dire of particular prospective jurors (e.g., claims four, five and six) and, for record support, probably require only a handful of reporter's transcript pages and juror questionnaires; while the remaining claims (e.g., claims one, two and three) focus on ineffective assistance issues that require assessments of prejudice under the *Strickland* test. Among these different types of claims, only the latter group—where an assessment of prejudice is in play—require anything resembling review and understanding of the full record of prior proceedings. And even for claims requiring an assessment of prejudice, there may be any number of ways of providing a "snapshot" of the case as submitted to the jury without giving us the entire, gargantuan record of all prior proceedings, such as, for example, providing only excerpts of reporter's and/or clerk's transcripts covering closing arguments, jury instructions, jury questions or verdicts, and any section 190.4, subdivision (e) determination.

26

The need to support appellate COA requests with record materials adequate for meaningful evaluation, in our view, is but a specific application of a more fundamental principle of appellate practice. "It is well settled . . . that a party challenging a judgment [or order] has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) " ' "A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed." ' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

## C. *Claim-by-Claim Successiveness Analysis*

We now turn to a claim-by-claim discussion of Seumanu's unexhausted claims, considering for each claim whether he has established an adequate justification for failing to raise these claims in the Initial Petition. In compliance with rule 8.392(b)(3), which requires that a COA request to the Court of Appeal "must identify the petitioner's claim or claims for relief and explain how the requirements of Penal Code section 1509(d) have been met," Seumanu attaches to his COA request a brief he filed in the trial court setting forth the arguments on which he relies. We now address those arguments.

For claims one, two, three, and five through nine, we conclude Seumanu has not "made a substantial showing that the claim is not successive within the meaning of section 1509(d)" (*Friend I*, *supra*, 11 Cal.5th at p. 748) and we will decline to issue a COA. None of these claims pass the debatable-among-jurists-of-reason test for substantiality. Because Seumanu has failed to meet the stringent pleading standard applicable to claims of ineffective assistance of counsel, and in several instances has failed to give us record materials sufficient for us to conduct meaningful review, "there is nothing for reasonable jurists to debate" (*Friend II*, *supra*, 76 Cal.App.5th at

p. 637).  With respect to one aspect of claim four, however, the pleaded allegations and the record are specific enough for us to conclude the substantial showing test has been met.  We will therefore issue a COA for claim four, in part.

### 1. Claim One

In claim one, Seumanu argues he was denied a fundamentally fair penalty phase trial because his trial counsel failed to object to the prosecution's characterization of a fight Seumanu was involved in as a 14-year-old.  It was prosecutorial misconduct to portray this incident as aggravating when in fact it was mitigating, Seumanu contends.  According to him, the confrontation that triggered the incident was not relevant for the alleged gambling—there was no evidence of that, he points out—but for the fight which ensued, which left him badly beaten and brain-damaged from a blow inflicted by a baseball bat.

In support of claim one, Seumanu argues that his former post-conviction counsel's failure to raise the issue of the prosecutor's mischaracterization of the "gambling" incident was ineffective assistance.  The trial court was unpersuaded.  After noting that, on direct appeal, the California Supreme Court rejected several claims of prosecutorial misconduct for lack of prejudice, the court expressed skepticism that "counsel's inclusion of this . . . claim among the existing litany of claims of prosecutorial misconduct would have turned the tide in his favor."

According to the trial court, trial counsel's awareness of possible brain damage—an awareness he confirmed in a declaration—led him to prioritize the retention of a neuropsychiatric expert prior to trial.  Seumanu makes no claim here that his trial counsel's failure to investigate evidence of brain damage was ineffective assistance of counsel.  (Cf. *Caro v. Woodford* (9th Cir. 2002) 280 F.3d 1247, 1255 [counsel knew of defendant's "extraordinary

28

history of exposure to pesticides and toxic chemicals, yet he neither investigated fully this history nor informed the experts who examined Caro of those facts that were known to him"].) If anything, the trial court pointed out, the record shows counsel's careful attention to the mitigating potential of the "gambling" incident, not blithe disregard of it. "Even accepting the dubious proposition" that the oversight alleged here "constituted deficient performance," the trial court concluded, Seumanu "fails to meet his high burden of showing prejudice."

The Exhaustion Petition does, to be sure, attach a declaration from Dr. Pablo Stewart, who opines "it is highly likely" Seumanu suffered brain damage from being hit with a baseball bat during a fight in connection with the "gambling" incident. Apparently, Seumanu attempted to meet the strict pleading burden here by providing the trial court with this and other declarations and documentary exhibits to support of his claim of ineffective assistance of counsel.[13] We know this because, in its order of dismissal, the trial court cited various items of evidentiary material. After reviewing the Exhaustion Petition and the evidence proffered in support of it, the trial court was not convinced that Seumanu's burden had been met.

Based on the limited record supplied to us, we cannot disagree. We too focus on Seumanu's pleading burden, but on appeal—including at the COA stage, as noted above—he also has the burden of providing us with an

_____

[13] Exhibit 3 of the Exhaustion Petition is an index by bates-numbered pages of (1) selected portions of the record of Seumanu's trial, including excerpts from 74 clerk's transcript (CT) volumes, excerpts from 25 reporter's transcript (RT) volumes, and 12 corrected CT volumes; (2) all briefs filed in the California Supreme Court in connection with Seumanu's direct appeal; and (3) the entire record of proceedings on the Initial Petition, consisting of the 10-volume petition itself and all eight exhibits attached to it, plus the informal response, the informal reply, and the order denying habeas relief.

adequate record to permit meaningful review on the highly expedited basis that governs the resolution of COA requests. (See *Friend II*, *supra*, 76 Cal.App.5th at p. 628.) It is quite clear that, in connection with the Initial Petition and the Exhaustion Petition, Seumanu's counsel did the work of culling portions of the record from past proceedings and proffering it in support of his various requests for habeas relief, together with supplementary declarations. But we have none of that material. When Seumanu filed his COA request, he did not even provide us a copy of the Exhaustion Petition. We highlighted that basic problem by ordering him to provide us a copy of the Exhaustion Petition and "any accompanying exhibits" on December 5, 2023. In response, he gave us the Exhaustion Petition and the three exhibits that were attached to it, but because those exhibits did not include the actual evidence filed or lodged with the trial court, they did not supply any meaningful additional information.[14]

Absent a basis to believe some dereliction by Seumanu's trial counsel prejudiced him at the penalty phase, his former postconviction counsel could not have been ineffective in failing to raise the issue in the Initial Petition. Seumanu urges us to find that, had the "gambling" incident been portrayed in the manner he now claims it should have been, he could have argued more effectively for life based on mitigating evidence of organic brain damage. But without any factual record to support the premise of the argument (proof that

---

[14] When the Exhaustion Petition and the attached exhibits were provided to us, we discovered that the exhibits included only a summary index of various record materials from the extensive history of past proceedings in this case. (See fn. 13, *ante*.) Exactly how much of these voluminous record materials might have been useful to us in evaluating whether Seumanu met his burden of making a successful COA showing, we cannot say. It was up to him to make that judgment *when he filed his COA request*, not to wait for us to tell him exactly what we would like to see.

he did in fact suffer from brain damage, and if so, the nature of it) and without anything in the record to help us consider how strongly that argument, if properly supported, might have weighed in the penalty phase calculus (an issue that would require us to situate the brain damage claim in the overall mix of aggravation versus mitigation), we have no basis to conclude that the incompetence of Seumanu's trial counsel likely deprived him of a better penalty phase outcome, and that his post-conviction counsel, in turn, was incompetent for overlooking the issue.

## 2. Claim Two

Claim two alleges that Seumanu was denied due process by virtue of trial counsel's failure to object to the prosecutor's misconduct in appealing to the jurors' passions and prejudices. Based on a declaration of counsel attached to the Exhaustion Petition, Seumanu alleges that, after trial was over and judgment was rendered, he discovered information that his prosecutor had a reputation for "cheating" in trials, and that her supervisors knew it, yet they acquiesced in her unethical practices.

In analyzing this issue, the trial court again noted that Seumanu had previously raised unsuccessful claims of prosecutorial misconduct on direct appeal. Not only did he specifically raise the issue of improper prosecutorial appeals to passion and prejudice in his direct appeal, the trial court pointed out, but the Initial Petition made nearly identical claims. In light of these unsuccessful prior prosecutorial misconduct claims, the trial court found, claim two "does not allege a new or different instance of prosecutorial misconduct"; rather it "amounts to an allegation that additional ammunition was available to support [Seumanu's] prosecutorial misconduct claims, and that post-conviction counsel was ineffective for failing to use that ammunition." The additional factual allegations Seumanu added in support

of the Exhaustion Petition, the trial court concluded, would not have made any difference to the outcome.

We have been given none of the newly discovered evidence supporting previously rejected allegations of prosecutorial misconduct. We have only the bare allegations in the Exhaustion Petition claiming the evidence is new. Nowhere does Seumanu allege or show that materials relating to the post-trial investigation on which he relies were unavailable at the time he filed the Initial Petition. And to the extent he alleges that his former postconviction counsel should have discovered those materials earlier than he did, we agree with the trial court that Seumanu failed to bear his burden of pleading ineffective assistance of counsel with particularity.

### 3. Claim Three

In this claim, Seumanu alleges error in a penalty phase jury instruction that did not allow the jury to consider the impact of his execution on his extended family. Seumanu argues that because victim impact evidence is admissible, it is only fair that a jury be allowed to hear how a defendant's family would be affected by his execution. "While this argument is not without a certain logical appeal," the trial court explained, "it is not the law. As recently as August 2021, the California Supreme Court reaffirmed its longstanding rule that 'a jury cannot consider sympathy for a defendant's family in mitigation.'" (See *People v. McDaniel* (2021) 12 Cal.5th 97, 156; *People v. Ochoa* (1998) 19 Cal.4th 353, 456.)

The trial court concluded that Seumanu could not have been prejudiced by legally correct jury instructions or by his trial counsel's failure to argue for a change in settled law," and it further concluded his counsel could not have been ineffective for failing to argue for a "wholesale change in the law." We agree with that assessment of this purely legal issue. Because it could not have been ineffective assistance for Seumanu's former post-

conviction counsel not to raise a baseless ineffective assistance claim against trial counsel, Seumanu has not met the strict pleading standard that applies here. The trial court correctly ruled that the ineffective assistance issue raised in the Exhaustion Petition is not " ' "one which would have entitled [Seumanu] to relief had it been raised and adequately presented in the initial petition." ' " (*Friend II*, *supra*, 76 Cal.App.5th at p. 639.)

### 4. Claim Four

In claim four, the first of six claims related to jury selection, Seumanu alleges the excusal of seven prospective jurors for cause was reversible error. This claim focuses on a group of jurors—Green 11, Blue 72, Blue 56, Red 44, Yellow 9, Black 51, and White 77—all of whom were excused during what is known in capital cases as the "death qualification" phase of jury selection. Death qualification is a process designed to confirm that, should the case proceed to a penalty trial, prospective jurors are open to considering the imposition of the death penalty.

Relying on various reporter's transcript excerpts from the voir dire and excerpts from juror questionnaires, Seumanu argues that these jurors should not have been excused, that his trial counsel was constitutionally ineffective for failing to object to their excusals, and that his former post-conviction counsel was constitutionally ineffective for failing to pursue the ineffectiveness of his trial counsel on this ground in the Initial Petition.

After reviewing the applicable standard as set forth in *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*) and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*), and applying that standard to each of these prospective jurors, the trial court stated it could not "conclude that the failure to challenge their excusal constituted ineffective assistance of counsel." Because the law accords great deference to the assessment of the attitudes of prospective jurors by the judge presiding over the voir dire, the trial court

found it highly unlikely, had trial counsel objected to the excusal of any of the seven individuals at issue, the challenge would have been successful.

The record supports that determination with respect to Green 11, Blue 56, Red 44, Yellow 9, Black 51, and White 77, but it does not with respect to Blue 72. The improper exclusion of even a single juror is sufficient to require resentencing in a capital case, even when the prosecution has peremptory challenges left when the juror is excused. (*People v. Heard* (2003) 31 Cal.4th 946, 966; see *Gray v. Mississippi* (1987) 481 U.S. 648, 666–668; *id.* at pp. 669–672 (conc. opn. of Powell, J.).) On this record, we believe reasonable jurists would have grounds to disagree about whether Blue 72 was improperly excused for cause, which would require a penalty retrial under *People v. Heard* and *Gray v. Mississippi.*

Blue 72 expressed uncertainty about how she would vote if the death penalty came up on the ballot, but expressed no religious, moral or philosophical compunctions against capital punishment. She said she was "neutral" on the death penalty, and then when pressed in voir dire, she said she did not want to be put in the position of having to decide on life versus death. The trial court's explanation for excusing her was "her own state of unwillingness and apparent lack of desire to be here."

Prospective jurors need not be enthusiastic about serving on a capital jury in order to be qualified for that grave task under the *Witherspoon-Witt* standard. The record here does not show any evidence of bias against the death penalty (*People v. Cain* (1995) 10 Cal.4th 1, 60; *People v. Garceau* (1993) 6 Cal.4th 140, 175) or inability to vote for capital punishment if the evidence warranted it (*People v. Wash* (1993) 6 Cal.4th 215, 255). Unless Blue 72 said something suggesting her "unwillingness" was an attitudinal propensity to disregard the evidence or the court's instructions, a mere "lack

34

of desire to be here" and face the difficulty of a making a penalty phase judgment was not enough to justify excusal.

Death qualification probes for neutrality. It is not a search for jurors who favor capital punishment. (*People v. Suarez* (2020) 10 Cal.5th 116, 139 [" 'Through the death qualification process, individuals may be excused not only for their unyielding opposition to capital punishment but also for their intractable support of it. [Citations.] . . . Disqualified jurors are properly excused for cause, not on the basis of their personal, moral beliefs regarding the death penalty, but because of their inability to "temporarily set aside their own beliefs in deference to the rule of law." ' "].)

We are not called upon to decide the merits of this claim now, and we emphasize that we do not do so. It seems possible that a full assessment of the record of the voir dire proceedings could reveal something in the stated views of Blue 72 that would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath.' " (*People v. Peterson* (2020) 10 Cal.5th 409, 429.) But on a prima facie basis, we conclude Seumanu has made a showing of deficient performance and prejudice by his trial counsel and hence by his former post-conviction counsel in failing to argue the improper exclusion of Blue 72 under *Witherspoon-Witt*. As to this particular prospective juror, therefore, Seumanu has made a substantial showing of non-successiveness based on ineffective assistance of counsel.

### 5. Claim Five

Claim five alleges that by allowing the prosecution and the defense to confer and stipulate to the removal of potential jurors off the record and prior to voir dire, the trial court deprived Seumanu of a fair trial. Seumanu complains that this procedure "upend[ed] the entire system designed by the Legislature [under Code of Civil Procedure sections 222 and 223] for ensuring

35

that jurors are randomly selected." This claim, the trial court said, presents "a novel question of law that does not appear to have been addressed by any court." But the trial court concluded "it is not necessary . . . to reach the merits of this question . . . because [Seumanu] fails to justify his failure to bring th[e] claim earlier. It was not ineffective assistance for post-conviction counsel to neglect to present a novel and untested legal claim, and [Seumanu] cannot establish prejudice from the failure to do so."

We agree with the trial court that the alleged practice of stipulating to excusals for cause in contravention of established statutory procedures for jury selection raises a novel issue of law. We agree, further, that trial counsel cannot be charged with deficient performance for engaging in a practice Seumanu has not claimed, and cannot claim, was so obviously at variance with established law that all reasonably competent counsel would have known to avoid it. Absent a viable claim of ineffective assistance against trial counsel, Seumanu has not met his burden of pleading that post-conviction counsel was ineffective for omitting claim five from the Initial Petition.

Even more fundamentally, we do not see any basis on the thin record we have been provided for concluding there is a reasonable likelihood the judge in Seumanu's capital trial would not have granted a motion to excuse for cause the jurors who were allegedly excused improperly by stipulation— i.e., that the outcome would have been different with respect to at least one of the jurors, thus establishing prejudice. In the absence of a record to evaluate this issue, what would have happened had such an objection been raised at trial is pure speculation. And without some factual basis to guide our analysis, Seumanu cannot meet his burden of showing reversible error on appeal, which makes further proceedings pointless.

### 6. Claim Six

In this claim, Seumanu alleges it was ineffective assistance for his trial counsel to stipulate to the removal of a prospective juror, Green 33, who had stated on a juror questionnaire that he could set aside his strongly held views against the death penalty and apply the law as instructed.

Pointing out that the juror in question was excused by stipulation, not for cause, the trial court took the view that this claim asked the court to second-guess trial counsel's tactical decision to enter into the stipulation. We agree with this assessment, especially since—according to the court's order of dismissal—trial counsel declared he was willing to stipulate to these excusals only where there was a reasonable basis to conclude a juror would be disqualified for cause.

According to the Exhaustion Petition, prospective juror Green 33's questionnaire indicated he was strongly opposed to the death penalty based on an "evolving belief" (he had been for the death penalty as a child) that killing is not a proper way to indicate disapproval of murder. But he also wrote that "although I do not endorse the death penalty, that is only my opinion and not the law. I know that I can apply the law as instructed, regardless of personal opinions." He was nevertheless dismissed via a group stipulation applicable to a number of prospective jurors.

Because trial judges are empowered to assess the stated views of prospective jurors like Green 33 and determine whether the person in question holds views that would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath' " (*People v. Peterson*, *supra*, 10 Cal.5th at p. 429), Green 33's equivocal questionnaire answer did, in fact, supply a basis for a reasonable judgment by counsel that he would likely be excused for cause. Thus, based on what the Exhaustion Petition alleges, we reject the

argument that trial counsel made a blind stipulation, heedless of whether Green 33 was vulnerable to a motion to excuse for cause.

On the record presented to the trial judge during voir dire, trial counsel may have had an argument that Green 33 was clear he could follow the law, even a strong argument, but there were some indications in the record pointing the other way. Accordingly, we see no basis for a claim of constitutionally deficient performance here. Nor do we see any basis for concluding there was prejudice, since we cannot rule out the possibility this juror would have been peremptorily challenged had the proper procedure been followed. Since there was no viable claim that trial counsel was ineffective, here again there was no basis to claim post-conviction counsel was ineffective.

### 7. Claim Seven

Claim seven challenges the constitutionality of excluding jurors for cause due to their inability to set aside their views about the death penalty. For prospective jurors with qualms about the death penalty, the ability of those jurors to set aside their personal views is the key issue during the death qualification phase of voir dire, as indicated above. According to Seumanu, by sweeping from capital juries those who have "scruples" about the death penalty, death qualification stacks capital juries *at the guilt phase* with jurors who are more likely to convict than a jury that is fairly representative of the community, serves as a proxy for racial and gender discrimination, and results in "conviction-prone" juries.

This is not a new argument in capital litigation. Were we writing on a clean slate, we would be inclined to give it close scrutiny. But over the course of decades, the applicable law has become well-established, and we do not see that changing any time soon. As Seumanu concedes, and as the trial court correctly observed, both the United States Supreme Court and the California

38

Supreme Court have consistently upheld the constitutionality of the death qualification process against constitutional attack under federal and state constitutional standards. (E.g., *People v. Poore* (2022) 13 Cal.5th 266, 298–300; see *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 19–69; *Lockhart v. McCree* (1986) 476 U.S. 162, 177–178.)

Under the stringent pleading standard Seumanu faces here, claim seven fails to state a claim of ineffective assistance of counsel. He cannot justify the belated presentation of an argument that, had he raised it, would have run contrary to long established precedent. Because there was no substantial likelihood such an argument would have succeeded if raised in the Initial Petition, his ineffective assistance claim against his former post-conviction counsel for omitting this claim in the Initial Petition fails for lack of any showing of deficient performance or prejudice.

### 8. Claim Eight

This claim, a variation on claim seven, "alleges that the process of death qualifying juries violates the statutory and constitutional rights of prospective jurors in California."

As the trial court recognized, claim eight adds a novel dimension to claim seven by focusing on the rights of scrupled jurors to serve on capital juries. Seumanu cites no precedent supporting the theory, and provides no proof that reasonably competent counsel would have objected to the death qualification process in his case on this ground, at trial or in the Initial Petition. Nor has he made a showing of any substantial likelihood the legal argument supporting the claim would have met with any success at either of those prior points in time, or now for that matter.

Accordingly, we conclude that Seumanu's attempt to argue ineffective assistance of counsel as a basis for deeming claim eight non-successive fails on the same grounds claim seven fails.

39

### 9. Claim Nine

Seumanu's ninth claim, another variation on claim seven, mounts a frontal legal attack on the standard the United States Supreme Court adopted 40 years ago for evaluating excusals for cause in death qualification.

The novelty of this argument is that it relies on what has come to be called an "originalist" approach to constitutional argument. Specifically, Seumanu argues, the "substantial impairment" standard for excluding potential jurors in capital cases, developed by the United States Supreme Court under a Sixth Amendment framework enunciated in *Adams v. Texas* (1980) 448 U.S. 38 is inconsistent with current Sixth Amendment standards established in a series of later cases including *Jones v. United States (*1999) 526 U.S. 227, *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Crawford v. Washington* (2004) 541 U.S. 36, and *Blakely v. Washington* (2004) 542 U.S. 296, as well as with common law principles of jury selection as they were understood at the time of the founding.

The trial court was unpersuaded and so are we. In light of well-known recent trends in the high court's constitutional law jurisprudence, it may be an interesting question whether Seumanu might someday gain traction with an argument that *Lockhart v. McCree* should be revisited on "originalist" grounds. But from our perspective as an intermediate state court of review, it is sufficient to note that our Supreme Court has specifically rejected the theory. (See *People v. Poore*, *supra*, 13 Cal.5th at p. 299.) And in any event, however creative Seumanu's "originalist" argument is today, his counsel can hardly be faulted for failing to advance it at trial or in 2012 when he filed the Initial Petition. Thus, we conclude the ineffective assistance of counsel argument in claim nine fails for the same reasons claims seven and eight fail.

**D.** *Constitutionality of Section 1509(d) As Applied*

There is one final issue to consider, a constitutional question that is best framed by returning briefly to our background discussion of *Friend I* and the traditional two-step framework for analyzing successiveness issues that it adopted. Recall that, even in the case of successive habeas claims under section 1509(d) there are two narrow circumstances—actual innocence and categorical ineligibility for the death penalty—in which such claims will be entertained on the merits.

Seumanu concedes that this is not a case of actual innocence or ineligibility for the death penalty and thus does not attempt to argue that he clears the second hurdle in section 1509(d), but he does contend that, to the extent this statute narrows the second step of *Clark*'s miscarriage of justice exception, it is unconstitutional. The trial court addressed Seumanu's constitutional attack on section 1509(d) on this basis, and rejected the argument. In his proposed appeal, Seumanu seeks review of that ruling. Even if the Exhaustion Petition was properly deemed successive, Seumanu argues, he contends he is entitled to a COA on the constitutionality of section 1509(d).

### 1. Appealability

The as-applied constitutional challenge Seumanu asks us to address cannot be fairly characterized as the "successiveness question itself" (*Friend I, supra*, 11 Cal.5th at p. 746), which is the discrete issue the *Friend I* court held was appealable under section 1509.1(c) where capital habeas claims are dismissed for successiveness. The question presented here raises a related but slightly different issue. This constitutional attack on section 1509(d) rests on the premise that Seumanu's unexhausted claims *are* successive, but nonetheless, he argues, under the backstop exception laid out in *Clark*— applied as originally enunciated in 1993, before the exception was

41

narrowed—these claims should be considered on the merits. Because section 1509(d) strips him of that right to review, it is unconstitutional, he contends.

The question we pause to consider here is whether we have appellate jurisdiction to address this issue at all. (See *Keck, supra,* 232 Cal.App.4th at p. 301.) We conclude that we do.

Even though the constitutional issue Seumanu asks us to decide is not squarely within the appealability holding in *Friend I,* we think it is cognizable under the rationale the Supreme Court gave for that holding. As noted above, the court reasoned that the section 1509.1(c) COA standard "may be read to permit a certificate 'to issue when the petitioner has set forth a substantial argument that section 1509(d) does not apply at all' " *because the petition at issue is not successive.* (*Friend I, supra,* 11 Cal.5th at pp. 746–747.) That is why a superior court's ruling on successiveness may be appealed under section 1509.1(c) (subject to its COA screening mechanism), even though there is a statutory bar against using any "[s]uccessive petition . . . as a means of reviewing a denial of habeas relief" under section 1509.1, subdivision (a). A stricter reading, prohibiting all appeals from denials of capital habeas relief where a petition is found to be successive, would render dismissals on that basis wholly unreviewable, except where there is a substantial question of actual innocence or categorical ineligibility for capital punishment. (§ 1509(d).) The court rejected this interpretation because "leaving unsuccessful petitioners with no opportunity for appellate review at all would be contrary to the voters' evident intent to provide a statutory right of appeal, albeit a limited one, from denial of petitions deemed successive . . . ." (*Friend I, supra,* 11 Cal.5th at p. 747.)

Applying the same logic, we believe the COA standard under section 1509.1(c) "may be read to permit a [COA] 'to issue when the petitioner

42

has set forth a substantial argument that section 1509(d) does not apply at all' " (*Friend I*, *supra*, 11 Cal.5th at p. 746) because *section 1509(d) is unconstitutional*. In view of the harshness of the contrary reading—which would effectively insulate section 1509(d) from constitutional attack in the appellate courts—we believe the appealability reasoning in *Friend I* applies a fortiori. To avoid casting serious constitutional doubt on section 1509.1(c), the statute must be read to allow appellate review of constitutional challenges to section 1509(d). Accordingly, despite section 1509.1, subdivision (a)'s appealability bar in successive petition cases, we conclude that the discrete legal issue of section 1509(d)'s constitutionality may be appealed under section 1509.1(c) along with the successiveness issue itself, in both instances subject to the section 1509.1(c) COA screening mechanism.

## 2. Lack of any Basis To Reach the Merits in this Case

Turning to whether Seumanu is entitled to a COA on the issue of section 1509(d)'s constitutionality, he advances multiple grounds in support of this argument.

According to Seumanu, section 1509(d) eliminates the following two circumstances that would have been sufficient to invoke *Clark*'s backstop exception: (1) a highly prejudicial error of constitutional magnitude (*Clark*'s first miscarriage of justice circumstance), and (2) presentation in a capital trial of a grossly misleading and highly prejudicial profile of the petitioner (*Clark*'s third miscarriage of justice circumstance). Seumanu contends that the deletion of these two prongs of *Clark*'s test violates due process, vitiates the constitutional right to habeas corpus, constitutes an unconstitutional retroactive change in the law, and violates equal protection.

We believe two of these four arguments have been rejected by the California Supreme Court (see *Briggs*, *supra*, 3 Cal.5th at pp. 841–845 [equal protection]; *Friend I*, *supra*, 11 Cal.5th at pp. 742–745 [retroactivity]), which

43

leaves only the due process and vitiation of the writ issues for consideration. Seumanu insists that his equal protection arguments are not foreclosed by *Briggs*, but assuming he is right about that, we decline to address and resolve any of his constitutional attacks on section 1509(d) despite having concluded we have jurisdiction to entertain them in this case.

Seumanu argues that "In [*Friend I*], the court noted that the new restrictions on successive petitions in section 1509(d) posed 'novel and serious' constitutional questions. . . . Indeed, the court explicitly left open whether the statute's narrowing of the *Clark* exception was unconstitutional." "These 'novel and serious' questions are squarely presented in this case," according to him. We do not think they are.

The essential wisdom of the Supreme Court's reading of the term "successive" in *Friend I*, as we read the opinion there, is that it removed the necessity to resort to the *Clark* backstop exception in all but the rarest of rare cases. We cannot predict whether, after *Friend I*, a case might arise where none of the three non-successiveness criteria enunciated by the Supreme Court applies (*Friend I*, *supra*, 11 Cal.5th at p. 731), but at least one of the two discarded miscarriage of justice circumstances in *Clark* is nonetheless present (*Friend I*, at p. 728), thus triggering *Clark*'s backstop exception as it stood before it was narrowed by Proposition 66, and concretely presenting the as-applied constitutional arguments Seumanu proposes to make. But if there remains a real possibility that such a case may arise, we are not convinced this is it.

As with several of Seumanu's unexhausted claims when tested for successiveness, the insurmountable problem for him here is prejudice, a quintessentially record-specific issue. For each of the two *Clark* miscarriage of justice circumstances Seumanu focuses upon (the first and the third), there

44

must be a showing that, absent the alleged constitutional violation, no reasonable judge or jury would have convicted the petitioner or sentenced him to death. (*Clark*, *supra*, 5 Cal.4th at pp. 797–798.) That prejudice standard is more demanding than the ineffective assistance of counsel prejudice standard, and Seumanu gives us no reason to believe he meets it.

Seumanu's arguments are so broadly framed that they resemble attacks on the facial constitutionality of section 1509(d). Because he engages in no meaningful attempt to show how circumstances one or three of the *Clark* miscarriage of justice test applies to *this case*, we are unpersuaded that *Clark's* backstop exception would rescue any of his unexhausted claims from dismissal even if that case retained its full vitality. Phrased in the terminology of the section 1509.1(c) standard for issuance of a COA, we conclude Seumanu fails to make a substantial showing that, *as applied to him*, there is any constitutional infirmity in section 1509(d).

## VI. CONCLUSION AND DISPOSITION

We grant Seumanu's request for the appointment of Michael Snedeker and Lisa Short as his counsel in this appeal effective nunc pro tunc to September 26, 2023, subject to the caveat that we lack authority at this time to authorize compensation.

We grant, in part, Seumanu's request for a COA as to claim four in the Exhaustion Petition. We will entertain Seumanu's appeal of the issue of successiveness on that claim to the extent he argues it was ineffective assistance for his former postconviction counsel to omit from the Initial Petition any contention that prospective juror Blue 72 was improperly excused for cause, and that, as a result, a penalty retrial is required. As to the other prospective jurors embraced by claim four and as to the remaining

45

eight claims in the Exhaustion Petition, Seumanu's request for a COA is denied.

We think the burden a section 1509.1(c) COA requester must meet in providing a sufficient record is clear (see *Friend II*, *supra*, 76 Cal.App.5th at p. 628), but since we have only today further expounded upon that burden, we recognize the potential that, in this case, Seumanu may not have anticipated the need to provide more record materials than he did in making his COA request. (See conc. opn. of Goldman, J., *post*.) To the extent Seumanu believes he should be given an opportunity to supplement the record before us, we invite him to move for reconsideration of our denial of a COA on any of his claims, bearing in mind that time is of the essence in doing so and we may deny the motion simply because it impedes our ability to decide this appeal expeditiously.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

46

GOLDMAN, J., Concurring.

We take this opportunity to offer some additional observations, outside of our main opinion, on the procedures governing requests for a certificate of appealability and the instructions that are provided to counsel who prepare them.  We start by recalling the point made by our colleagues in Division Three that the request should " 'include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.' " (*In re Friend* (2022) 76 Cal.App.5th 623, 637 [quoting *People v. Duvall* (1995) 9 Cal.4th 464, 474].)  As the court explained, "Unless the capital record on appeal has been lodged with the appellate court, the pre-Proposition 66 practice of simply citing to transcript pages in the record is unhelpful to a meaningful evaluation of whether the requisite substantial claims have been presented." (*Ibid.*)

As we note in the main opinion, there is no provision for lodging the capital record in the Court of Appeal; record preparation does not begin unless and until a court issues a certificate of appealability.  (See Cal. Rules of Court, rules 8.395(c)(2), 8.392(c)(2).)  In this respect, California's procedure for certificates of appealability differs from its federal analogue, where the district court clerk is required to transmit the file to the court of appeals upon the filing of the notice of appeal.  (Fed. Rules App. Proc., rule 22(b)(1), 28 U.S.C.)  When determining whether a certificate of appealability should issue, the federal appellate court or judge thus bases the decision on "the district court pleadings, the record, and the COA application."  (*Houser v. Dretke* (5th Cir. 2004) 395 F.3d 560, 562; see, e.g., *United States v. Springfield* (10th Cir. 2003) 337 F.3d 1175, 1177–1178; *Wilkinson v. Cowan* (7th Cir. 2000) 231 F.3d 347, 350.)  By contrast, since we do not have access

1

to any of the pleadings or record materials filed or lodged in the trial court, we can only consider what the appellant has given us.

This point—made by our Division Three colleagues in *Friend* and amplified in our opinion today—is not expressly addressed in California Rules of Court, rule 8.392(b)(3), which governs requests for a certificate of appealability. After stating that the request must be attached to the notice of appeal, it provides only that "[t]he request must identify the petitioner's claim or claims for relief and explain how the requirements of Penal Code section 1509(d) have been met." There is also a mandatory form, HC-200, that the Judicial Council prescribes for use in this situation, but it does not directly advise appellants of the necessity of attaching the record materials supporting the appellant's explanation why the statutory requirements for a certificate of appealability are satisfied.[1] While practitioners must familiarize themselves with the caselaw construing statutes and rules, we also acknowledge that the certificate of appealability procedure is new to California law, and the Judicial Council may wish to consider revising the rule and/or the form in light of appellate courts' clarification of what is expected.

Lastly, we note that, because the request for a certificate of appealability is attached to the notice of appeal, under current practice the record materials supporting the request would be filed in the trial court, only for that court to transmit them to the Court of Appeal. To avoid burdening

---

[1] Judicial Council Form HC-001, which may be used to file a petition for habeas corpus, expressly references the requirement in *People v. Duvall, supra*, 9 Cal.4th at page 474, that the claims be supported by declarations, relevant records, transcripts, or other documents. *Friend* quoted *Duvall* when it held that the same requirement applies to requests for a certificate of appealability. (*In re Friend, supra*, 76 Cal.App.5th at p. 637.)

2

trial courts with unnecessary filings, we do not preclude the possibility that an appellant could instead file supporting materials directly with the Court of Appeal.  Currently, however, the rules do not explicitly provide for that option, and appellants must take care to ensure that such an approach does not delay the court's ability to consider the request.

GOLDMAN. J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

3

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:   Hon. Thomas Stevens

Counsel:       Michael R. Snedeker and Lisa R. Short, under appointment by
               the Court of Appeal, for Appellant.

               Rob Bonta, Attorney General, Lance E. Winters and James
               William Bilderback II, Senior Assistant Attorneys General,
               Alice B. Lustre, Supervising Deputy Attorney General, for
               Respondent.

*In re Seumanu* – A169146